# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GARY G. FLETCHER**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 2:09cv1272 |
| | ) | Electronic Filing |
| **COMAST COMPREHENSIVE** | ) | |
| **HEALTH AND WELFARE PLAN;** | ) | |
| **COMCAST CORPORATION;** | ) | |
| **HM LIFE INSURANCE COMPANY;** | ) | |
| **and AETNA LIFE INSURANCE CO.** | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

Gary G. Fletcher ("plaintiff") commenced this action against Comcast Corporation ("Comcast"), Comcast Comprehensive Health and Welfare Plan ("the Plan"), Highmark Life Insurance Company ("Highmark") and AETNA Life Insurance Company ("Aetna") seeking redress for an alleged violation of § 1132(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"). Plaintiff claims defendants improperly calculated his Short Term Disability ("STD") and Long Term Disability ("LTD") benefits, and improperly offset his Social Security Disability ("SSD") benefits against his LTD benefits under the Plan, all of which resulted in an underpayment of his benefits. Presently before the court is defendants' motion for summary judgment. For the reasons set forth below, the motion will be denied.

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the

existence of any element essential to that party's claim, and upon which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim. National State Bank v. National Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986) (quoting Fed. R. Civ. P. 56(a), (e)) (emphasis in Matsushita). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

The record as read in the light most favorable to plaintiff establishes the background set forth below. Plaintiff was employed by Comcast as an account executive in its sales department. As a Comcast employee, he participated in the Plan which provided both STD and LTD benefits. To effectuate these components of the Plan, Highmark issued Group Disability Policy No. 912889 ("the Policy") effective July 1, 2003. Aetna was the claims administrator that processed STD and LTD claims.

In August of 2003, plaintiff became unable to work due to cardiomyopathy. His last day of work was on or about August 29, 2003. Plaintiff filed a disability application under the Plan and was granted STD benefits effective September 9, 2003. On October 24, 2003,

Comcast discontinued plaintiff's STD benefits effective October 3, 2003. Plaintiff appealed

the decision, and by letter dated April 22, 2004, Comcast upheld the denial of STD benefits,

finding no information to support disability from the period between October 3, 2003, through

March 9, 2004. The letter indicated, however, that a decision had been made to open a new

disability claim commencing on March 10, 2004, based on plaintiff's functional impairment of

anxiety and panic attacks. The Plan began paying plaintiff STD benefits for this disability

claim effective March 17, 2004, and continued payment until September 15, 2004.

 In addition to applying for Plan benefits, plaintiff applied to the Social Security

Administration (SSA) for disability benefits due to his cardiomyopathy. By letter dated May

24, 2004, he was awarded $1,336.00 per month in Social Security Disability ("SSD") benefits.

Am. Compl. ¶ 24 (Doc. No. 32) at 4. The SSA found plaintiff's disability date to be

September 3, 2003, with a benefit entitlement date of March 2004.[1] Id.

 After plaintiff exhausted his STD benefits, he became eligible to receive LTD benefits.

On August 11, 2004, defendants sent a letter advising plaintiff about the application process for

LTD benefits. It stated that LTD benefits are "offset," or reduced, by any other disability

benefits that the claimant receives, "such as Social Security . . . ." Ex. A-11 (Doc. No. 50-11)

at 2. Plaintiff indicated that he had applied for SSD benefits on his LTD benefits application.

 On October 14, 2004, defendants sent plaintiff a letter notifying him that he qualified

for LTD benefits based on a disability date of March 10, 2004. Ex. A-13 (Doc. No. 50-13) at

1. This letter set forth plaintiff's LTD benefits calculation and informed him that his LTD

---

[1] The SSA requires that an individual be disabled for five full months before he or she can be entitled to benefits.

benefit would be offset by $1,336.00 per month, the amount he received in SSD benefits. It

explained: "[your] gross monthly benefits amount has been calculated to be $2,304.98 and is

based on 60% of your Lost Monthly Income." Id. at 2. It included the following step-by-step

calculation:

> Your LTD Benefit is equal to you [sic] Net Monthly Benefit, as determined below:
>
> Step 1: Multiply your Lost Gross Monthly Income by the Benefit Percentage.
>
> Step 2: Multiply your Lost Gross Monthly Income by 70% and from that subtract the amount of all Other Income Benefits.
>
> Step 3: Compare the amounts from Steps 1 and 2 above with the Maximum Monthly Benefit. Your LTD Benefit will be the lesser of the three amounts. This is your Net Monthly Benefit.
>
> LTD Benefit based upon 60% of Lost Monthly Income = $2,304.98
> LTD Benefit based upon 70% of Lost Monthly Income = $2, 689.15
> Less Social Security Disability = $1, 353.15
>
> Based upon the above policy provision, your LTD monthly benefit has been calculated to be $1,353.15.

Id. Additionally, the letter quoted the Policy's disability definition as well as its mental

health limitation provision.2 The letter did not: (1) define the meaning of "Lost Monthly

Income", a term found only in the Policy, (2) include a figure reflecting what plaintiff's

"Lost Monthly Income" was, or (3) contain any information about whether "Lost

Monthly Income" was calculated based on total yearly earnings divided by the number of

months plaintiff actually worked in the preceding calendar year or total yearly earnings

---

2 The Policy is the official Plan document and the referenced provisions in the Policy and the Plan are identical. The Plan, however, is not to be confused with the Summary Plan Description ("SPD"), as the SPD does not contain the provisions that form the basis of plaintiff's claims.

4

divided by twelve.  Defendants began paying plaintiff $1,353.15 per month in LTD

benefits effective September 15, 2004.

On February 21, 2005, defendants discontinued plaintiff's LTD benefits effective

March 1, 2005, and plaintiff appealed.  On July 26, 2005, defendants reversed their

earlier denial and reinstated his LTD benefits effective March 1, 2005.  On July 10, 2008,

defendants discontinued plaintiff's LTD benefits for the second time, effective July 16,

2008.  Plaintiff retained an attorney and appealed that denial by letter dated March 5,

2009.

In the March 5, 2009, appeal, plaintiff questioned the offsetting of his LTD

benefits by the amount of SSD benefits he received.  With regard to the offset provision,

the Policy provides:

> Other Income Benefits will be used to reduce the STD and LTD Benefit
> payable under the Group Policy, as described in Parts 3.F. and 4.F., Calculating
> Your STD and LTD Benefits.
>
> Other Income Benefits mean the total amount of other income which you
> or your depends receive or are eligible to receive, including:
>
> Disability or retirement benefits under the Social Security Act . . . *unless
> you were receiving them prior to becoming Disabled*;

Ex. A-22 Policy (Doc. No. 50-22) at 20 (emphasis added).  Plaintiff prevailed in the

March 5, 2009, appeal and by letter dated March 13, 2009, defendants reversed the July

10, 2008, denial.  Plaintiff's LTD benefits were reinstated effective July 16, 2008, but his

allegation as to the improper offsetting of his LTD benefits was never addressed.  On

September 18, 2009, plaintiff filed the instant action.

Defendants contend they are entitled to summary judgment because plaintiff's

claims are barred by Pennsylvania's four-year statute of limitations. First, plaintiff's claims for the alleged miscalculation of STD and LTD benefits purportedly accrued on April 22, 2004, and October 14, 2004, respectively, when plaintiff first received the letters awarding benefits because they served as a "clear repudiation" of his benefits. Second, plaintiff's cause of action for the alleged improper offsetting of LTD benefits also accrued on October 14, 2004, because the offset was applied to his first LTD payment. Finally, defendants argue that because plaintiff did not file suit until September 18, 2009, his failure to file within the four-year limitations period bars his claims as a matter of law.

Plaintiff disputes the dates of accrual and contends that the limitations period has not expired because the receipt of the STD and LTD payments did not suffice to alert him that he was receiving less than he was owed and thus did not constitute a "clear repudiation" of benefits. Defendants' failure to define and explain certain Policy provisions in the April and October award letters prevented plaintiff from discovering the alleged underpayment. Alternatively, plaintiff argues that equitable tolling applies and contests the expiration of the statute of limitations on this basis as well.

The record and applicable law demonstrate that a genuine issue of material fact exists as to whether the statute of limitations has expired on plaintiff's claims. Critical to that inquiry is whether plaintiff's initial receipt of the allegedly miscalculated payments served as a "clear repudiation" of benefits, such that his claims can be said to have accrued in 2004.

Unlike claims for breach of fiduciary duty, ERISA does not contain a statute of limitations for non-fiduciary claims. Syed v. Hercules Inc., 214 F.3d 155, 158-59 (3d Cir.

2000).  In this setting, the applicable limitations period is that of "the forum state claim most analogous to the ERISA claim at hand."  Romero v. Allstate Corp., 404 F.3d 212, 220 (3d Cir. 2005).  Pennsylvania's four-year statute of limitations for breach of contract actions has been held to be applicable to non-fiduciary claims under ERISA.  Hahnemann University Hosp. v. All Shore, Inc., 514 F.3d 300, 305-06 (3d Cir. 2008) (stating that "[t]he statutory limitation most applicable to a claim for benefits under Section 1132(a)(1)(B) is a breach of contract claim" and noting that "[i]n Pennsylvania, a breach of contract claim has a statute of limitations of four years.").

The four-year limitations period starts running as of the date the cause of action accrues.  Romero, 404 F.3d at 221.  The date of accrual for an ERISA non-fiduciary claim is determined as a matter of federal common law.  Id.; see also Miller v. Fortis Benefits Insurance Co., 475 F.3d 516, 520 (3d Cir. 2007) ("The accrual date for federal claims is governed by federal law, irrespective of the source of the limitations period.").  Absent a controlling federal statute, courts utilize the federal "discovery rule" to determine the accrual date of a federal claim.  Miller, 475 F.3d at 520; see also Romero, 404 F.3d at 222 (collecting cases).  Under the discovery rule, "a claim will accrue when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim."  Miller, 475 F.3d at 520; see also Romero, 404 F.3d at 222 (same).

In the ERISA context, the discovery rule has been "developed" into the more specific "clear repudiation" rule, whereby a non-fiduciary cause of action accrues when a claim for benefits has been denied.  Id. at 520-21.  A formal denial is not required, however, if there already has been a repudiation of the benefits which was (1) clear and (2) made known to the

beneficiary.  Id. at 521; see also Romero, 404 F.3d at 222-23.  Put simply, the statute of limitations may be triggered by some "event other than a denial of a claim" where that event *clearly alerts* the plaintiff that his entitlement to benefits has been repudiated.  Miller, 474 F.3d at 521 (emphasis added).

"The key inquiry is whether the plan participant had 'reasonable discovery of the actionable harm.'"  Grasselino v. First Unum Life Ins. Co., 2008 WL 5416403, *4 (D. N.J. December 22, 2008) (quoting Miller, 475 F.3d at 522).  Implicit in this notion is the understanding that "[t]he beneficiary should exercise reasonable diligence to ensure the accuracy of his award."  Miller, 475 F.3d at 522.

In Miller, the United States Court of Appeals for the Third Circuit recognized that "an erroneously calculated award of benefits under an ERISA plan *can serve* as 'an event other than a denial' that triggers the statute of  limitations, as long as it is (1) a repudiation (2) that is clear and made known to the beneficiary." 475 F.3d at 521 (emphasis added).  An underpayment of benefits can satisfy the first requirement because "a plan's determination that a beneficiary receive less than his full entitlement is effectively a partial denial of benefits" and, just like a denial, "is adverse to the beneficiary and therefore repudiates his rights under a plan." Id.; cf. 29 C.F.R. § 2560.503-1(m)(4) (defining "adverse benefit determination" to include "a denial, reduction, or termination of, or a failure to provide or make payment (*in whole or in part*) for, a benefit") (emphasis added).  Turning to the second requirement, the court explained that "repudiation by underpayment *should ordinarily* be made known to the beneficiary when he first receives his miscalculated benefit award."  Id. (emphasis added); see also Gluck v. Unisys Corp., 960 F.2d 1168, 1180-81 (3d Cir. 1992) ("[A]n employee's receipt

of diminished payment gives immediate, obvious notice to an employee that something is amiss . . . .").  An underpayment should serve to put the beneficiary on notice that "he has been underpaid and that his right to a greater award has been repudiated."  <u>Miller</u>, 475 F.3d at 522.

Plaintiff has adduced sufficient evidence to create a genuine issue of material fact as to whether the April and October award letters constituted a "clear repudiation" of benefits within the meaning of <u>Miller</u>.  A reasonable finder of fact could conclude that the letters did not suffice to alert plaintiff that his benefits were being repudiated.

In <u>Miller</u>, the plaintiff became disabled following heart surgery.  474 F.3d at 517. Approximately fourteen months before the surgery, he was employed as a casino floor worker making $690 per week.  <u>Id.</u>  Immediately before becoming disabled, he worked as an outside marketing salesman earning $768 per week.  <u>Id.</u>  When he became disabled  he filed a claim for LTD benefits under his employer's plan, the terms of which entitled him to 60% of his current salary until the age of sixty-five.  <u>Id.</u>  When his employer reported his salary to the insurance company, it mistakenly stated that he still held his old position as a casino floor worker earning $690 per week.  <u>Id.</u>  The plaintiff received disability payments based on the wrong salary for fifteen years until he realized the erroneous calculation.  <u>Id.</u>  Relying on the fact that the plaintiff's failure to do basic math was the only barrier that prevented him from discovering his "injury" for fifteen years, the Third Circuit held that his "claim accrued upon his initial receipt of the erroneously calculated award" because "a simple calculation of sixty percent of his salary *should have alerted him* that he was being underpaid."  <u>Id.</u> at 522 (emphasis added).

Defendants' contention that <u>Miller</u> is dispositive of plaintiff's claims is misguided.

Defendants argue that plaintiff should have discovered his injury upon the initial receipt of benefits because the "benefits under the plan equal 60% of an employee's [salary]" which the Miller court "found to be a simple calculation under which underpayment is an obvious repudiation." Def. Brief (Doc. No. 52) at 14. Miller, however, does not stand for the proposition that every erroneously calculated benefit award automatically serves as a "clear repudiation." Careful review of the facts indicates that unlike Miller, this case is not about an injury that should have been discovered through a "simple calculation" based on facts already known to plaintiff.

In finding that the initial payment served as a "clear repudiation" of benefits in Miller, the Third Circuit highlighted the fact that the plaintiff provided no basis "to infer that the repudiation was unclear to him at that time" and "[did] not complain about the notice provided to him of his rights or entitlements under the plan." Id. at 522-23. Significantly, the court drew attention to the fact that the plaintiff could not point to any facts that would establish why he had "reason to be unaware" of the error upon the initial receipt of benefits. Id. at 522.

In contrast, whether defendants provided and/or plaintiff received adequate notice and had reason to be aware of a reduced amount in the calculation of benefits essentially is at the heart of plaintiff's case and distinguishes it from Miller. Plaintiff's claim of miscalculated LTD benefits is grounded in whether defendants improperly divided his annual income in 2003 by twelve months, despite the fact that he only worked for eight months before becoming disabled. Unlike Miller, the question is not whether the amount he received in LTD benefits was consistent with 60% of his salary, or whether it was based on the proper employment position. It is whether he was entitled to have his income divided by the number of months he

10

actually worked in 2003, and whether the October letter clearly alerted him to or should have alerted him to the fact that something was amiss in the calculation and further investigation was necessary.

Plaintiff argues that the October letter was not a "clear repudiation" of his LTD benefits because he did not have notice of the specific Policy provisions that would have enabled him to determine that the benefits he received were in an amount that was less than what he was owed. Plaintiff assertedly had "reason to be unaware" of the miscalculation because the October letter did not explain the meaning of "Lost Monthly Income," an omission which prevented the letter from "clearly alerting" him to the fact that his entitlement to benefits had been repudiated.

Under the terms of the policy, "Lost Monthly Income" is defined as "your Predisability Monthly Income minus your monthly Recovery Work Earnings, if any." Policy (Doc. No. 50-22) at 12. The Policy defines "Predisability Monthly Income" ("PDI") as:

> [Y]our average monthly compensation from the Policyholder during the calendar year prior to the date you become Disabled as reported on the most recent W-2 form received from the Policyholder.

> If you have not yet received a W-2 form from the Policyholder, Predisability Monthly Income means your average monthly compensation from the Policyholder prior to the date you become Disabled . . . .

Id. at 9. Plaintiff had no applicable Recovery Work Earnings and therefore his "Lost Monthly Income" and "PDI" were equivalent.

Plaintiff alleges that in calculating his PDI, defendants improperly took a twelve-month average of his 2003 earnings, rather than calculating "a true average rate for [his actual] 8 months of 2003 work." Plaintiff's Brief (Doc. No. 55) at 7. He argues that "this Policy

definition makes clear that, for a year in which the employee in question worked less than a full year, the monthly average should be reached by dividing total compensation by the number of months worked, not by 12 months." Id. at 12. As a result, the amount he received in benefits purportedly is not the amount he was entitled to under the Policy.

It is undisputed that the October letter did not include the definition of "Lost Monthly Income" or reference a means by which the meaning of the term could be ascertained. According to plaintiff, if the Policy definition had been provided in the October letter as was required under federal regulations, he would have had notice of his right to have his annual income divided by eight instead of twelve months.[3]

The merit as to whether plaintiff's benefits should have been calculated based on eight as opposed to twelve months is not before the court at this time. At summary judgment, however, the record is read in the light most favorable to plaintiff, and his interpretation of this provision must be accepted as true. Defendants concede as much by reserving the right to address the subsequent procedural development and the merits of plaintiff's claims in the event their motion for summary judgment is denied. Thus, at this juncture it must be assumed that under the terms of the Policy, plaintiff was entitled to have defendants take an eight-month average of his 2003 earnings.

The October letter stated that plaintiff's "gross monthly benefits amount has been calculated to be $2,304.98 and is based on 60% of [his] Lost Monthly Income" and contained a

_____

[3] The ERISA regulations require that "[a plan's] adverse benefit determination . . . shall set forth, in a manner calculated to be understood by the claimant . . . [r]eference to the *specific plan provisions* on which the determination is based . . . ." 29 C.F.R. § 2560.503-1(g)(1) & (g)(1)(ii) (emphasis added).

step-by-step formula explaining how plaintiff's LTD benefit was calculated. Oct. Letter (Doc. No. 50-13) at 2-3. As previously noted, however, it did not include a definition of "Lost Monthly Income" or quote or summarize the provision in which it is defined in the Policy, notwithstanding the fact that it is a specific term that is found only in the Policy itself, and not in the Summary Plan Description ("SPD").[4] The SPD stated that "[y]our LTD benefit is determined based on your "monthly base earnings." Summary Plan Description (Doc. No. 50-21) at 13. For a commissioned employee like plaintiff, "monthly base earnings" is "the monthly average of prior year Form W-2 adjusted earnings received . . . ." Id. It defined "PDI" as "the amount of your monthly income that was insured on the last day you were actively at work prior to becoming disabled." Id. at 20.

Plaintiff argues that as opposed to the actual Policy, neither the October letter nor the SPD contained any information about the number of months that would be used to determine "Lost Monthly Income" *where the employee did not work a full calendar year prior to becoming disabled*. While the SPD did define PDI, it was a different definition than the one found in the Policy and did not contain or reference the language that forms the basis of plaintiff's claims. Without having seen the Policy definitions of "Lost Monthly Income" and "PDI", plaintiff argues that he could not have been made aware of his entitlement to have his benefits determined by an eight-month average of his 2003 earnings.

Unlike Miller, plaintiff is "complain[ing] about the notice provided to him of his rights or entitlements" under the Plan and has pointed to facts that "help establish that [he] had reason

---

[4] The SPD is a document which summarizes important policy provisions that all plan participants receive. Plaintiff concedes he was in possession of the SPD solely for the purposes of this motion.

to be unaware in [2004] that there was an error." 475 F.3d at 522-23. Plaintiff has sworn that he did not have a copy of the Policy until his attorney obtained one in December of 2008. Affidavit of Gary G. Fletcher (Doc. No. 58) at 15. Consequently, he was not in possession of the only document that could have "clearly alerted" him to the fact that the amount he was receiving in benefits was not in accordance with his rights under the Plan.

Defendants' contention that plaintiff did not need to review the Policy to be aware of the repudiation is unavailing. They cite two cases to support the proposition that a clear repudiation occurs "even where a beneficiary does not possess the plan documents." Defs. Reply Brief, (Doc. No. 60) at 3. Both cases, however, are easily distinguished.

Bamgbose v. Delta-Group, Inc., 638 F. Supp.2d 432 (E.D. Pa. 2009), involved a claim for the denial of ERISA benefits. The plaintiff had entered into an independent contractor broker agreement ("ICBA") with the defendant. The ICBA clearly and unequivocally stated that the plaintiff was a "self-employed independent contractor, . . . with [the defendant] having no control, direction, or influence whatsoever over" the performance of his duties. Id. at 436. It also stated that the plaintiff "is not eligible for, and shall not participate in, any employee pension, health, or other fringe benefit plans of [the defendant]." Id. The plaintiff alleged that the defendants violated ERISA by improperly denying "certain healthcare workers access to these benefits by misclassifying them as independent contractors." Id. The court rejected the plaintiff's argument, stating that "the ICBA expressly stated that the plaintiff, as an independent contractor, was not entitled to participate in any employee pension, health, or other fringe benefit plan." Id. at 438. It found compelling the fact that the plaintiff did not "allege that he did not understand, at the start, that he would not be eligible to participate in the

defendants' benefit plans as an independent contractor." Id. at 438-39.

Finding no merit in the plaintiff's assertion that he was unaware of a repudiation because he had not seen the eligibility requirements in the plan documents, the court held that "the plaintiff here was specifically told at the outset of his relationship with the defendant that he would not participate in any [defendant] employee benefits plan because of his status as an independent contractor." Id. at 439. The ICBA that the plaintiff signed at the beginning of the relationship clearly apprised him of the fact that he was not eligible to receive employee benefits. Because he did not need the plan documents to make this discovery, the court held that the ICBA was a "clear repudiation" of benefits and dismissed his claim as untimely.

Keen v. Lockheed Martin Corp., 486 F. Supp.2d 481 (E.D. Pa. 2007), involved a claim for denial of benefits stemming from the defendant's failure to inform contingent workers of their possible eligibility to participate in an ERISA benefit plan. Id. at 483. Three plaintiffs sued the defendant on the basis that they were entitled to receive benefits under the plan as "common law employees" even though they held the status of contingent workers. Id. Each plaintiff had actual knowledge of the fact that they were not entitled to benefits as contingent workers from the outset of their employment. Id. at 483-84, 485. The defendants had communicated the plaintiffs' ineligibility directly to two of them, and the other equally was aware of her ineligibility through other means. Id. The plaintiffs all claimed entitlement to benefits, however, because they were "common law employees" and the plan allowed for "common law employees" to receive benefits. Id. at 494. Although the three plaintiffs were aware of their ineligibility as of 1985, 1991, and 1993, none had filed suit until 2005. The court rejected their claims as untimely, finding that their rights had been "clearly repudiated"

15

the moment the fact that they were ineligible to receive benefits as contingent workers was communicated to them and "[they] understood this." Id. at 489.

As defendants point out, the Keen court noted that "Miller does not require plaintiffs to receive notice of plan terms before a clear repudiation can occur." Id. at 488. The court, however, did not end its analysis there. It extracted the important principle of "prior notice" from Miller, finding compelling the fact that the Keen plaintiffs understood from the beginning that they were ineligible to receive benefits. See id. at 489 (citing Miller, 474 F.3d at 523) (the beneficiary's *prior notice of his rights* under a plan mitigated the possibility that a benefits award might lull the beneficiary into inaction).

The principle of "prior notice" is the common denominator in both Bamgbrose and Keen. Despite not having seen the plan documents, the plaintiffs all had *prior notice* of their rights and simply never "pursued their suspicions that there might be a way for them to secure benefits" until it was too late. Keen, 486 F. Supp.2d at 489. Both cases highlight the fundamental principle underlying the federal discovery rule: plaintiffs must exercise "reasonable diligence" to "pursue their suspicions" regarding any right to receive benefits under a defendant's plans. The Bamgbrose and Keen plaintiffs did not require access to the actual plan documents to become cognizant of their injury. To the contrary, their rights were "clearly repudiated" once the fact that they were ineligible to receive benefits was communicated to them.

Here, the record as read in the light most favorable to plaintiff establishes that his alleged entitlement to have his annual income divided by the number of months he actually worked in 2003 was never communicated to him until his attorney requested and received a

16

copy of the Policy in 2008.  Defendants do not advance any evidence to establish that plaintiff received copies of the Plan or that such copies were made available to him at an earlier time.  It is undisputed that the SPD did not reference the specific provisions or concepts which form the basis of plaintiff's claims.  A reasonable  finder of fact could find that plaintiff did not previously entertain any "suspicion" of his right to the claimed entitlements.  Consequently, a reasonable juror could conclude that the October letter did not serve as a "clear repudiation" because it did not alert him to the fact that something might be amiss in his benefit calculations.

To hold otherwise would improperly blur the line between the obligation to exercise due diligence and the creation of a plan "watchdog."  See Romero, 404 F.3d at 224 (ERISA does not require "plan participants likely unfamiliar with the intricacies of pension plan formulas and the technical requirements of ERISA, to become watchdogs over potential plan errors and abuses") (internal quotation marks omitted).  In Miller, the court expressly stated that turning plan participants into watchdogs was a "concern [that] is not implicated here" because the plaintiff did not contest having sufficient notice of his rights and "it [readily was] apparent that [the plaintiff] simply failed to investigate his benefit determination for fifteen years."  474 F.3d at 523.  The court emphasized that "the need for Miller to be vigilant *was triggered only when his receipt of benefits alerted him* that his award had been miscalculated." Id. (emphasis added).

Here, to hold that plaintiff "simply failed to investigate" whether his monthly benefits had been calculated in accordance with a Policy provision that he had no knowledge of or ready access to would "impose on him a burdensome oversight role."  Id.  Further, because a

genuine issue of material fact exists as to whether the October letter "alerted" him to the alleged error, the proposition that his "need to be vigilant" was "triggered" by the monthly payments starting in 2004 is unavailing. In other words, a reasonable finder of fact could conclude that the failure to define or provide further reference to the manner in which the term "Lost Monthly Income" actually was defined prevented plaintiff from gaining "reasonable discovery of harm" regarding the underpayment, the key inquiry under Miller. The facts also would support a finding that a "simple calculation based on 60% of [plaintiff's salary]" would not have made plaintiff "aware that he ha[d] been underpaid and that his right to a greater award ha[d] been repudiated." Compare Miller, 475 F.3d at 522. Thus, this aspect of the October letter likewise was not a "clear repudiation" of LTD benefits. Consequently, material issues of fact remain as to whether the October letter apprising plaintiff of the LTD benefit calculation sufficiently gave him notice or should have given him notice of the fact that he had been injured.

To hold otherwise also would run the risk of blindly applying the clear repudiation rule where the initial benefit awards failed to comply with any of ERISA's specific requirements governing a denial of benefits. The statute mandates that all employee benefit plans shall:

> Provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participants; and

> Afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133. As previously noted, the Secretary of Labor has implemented these

statutory mandates by promulgating a specific regulation governing the notice of adverse

benefit determinations and the content of such notices.   Both the statute and the regulations

require that any adverse determination clearly alert the claimant to "the specific plan provisions

on which the determination is made" and advise the claimant about appropriate avenues for

further review.  Given these requirements, it is difficult to comprehend how it can be held that

a determination that did not purport or appear to be adverse either explicitly or by known

circumstances and did not comply with any of the statutory and regulatory requirements that

must accompany an adverse benefits determination was a "clear repudiation" of a claim

founded on a component of the statutorily mandated notice requirements.  To follow such an

approach would be tantamount to excusing compliance with the notice requirements without

any statutory or persuasive basis to so.

 A genuine issue of fact also exists as to whether the April 2004 letter served as a clear

repudiation of plaintiff's STD benefits.  Plaintiff contends that he was entitled to have his

"weekly base average" determined on a 35-week average, instead of a 52-week average, to

reflect the number of weeks actually worked.  Plaintiff asserts that the April letter did not

indicate the amount of STD benefits plaintiff would receive and provided no information that

would have enabled him to determine how his STD benefits were calculated and whether the

calculation was in accordance with the terms of the Policy.  See April 22, 2004 Letter (Doc.

No. 58) at 11.

 As applicable to plaintiff, the SPD defines "Weekly Base Pay" as the "[p]rior year W-2

average weekly income."  (Doc. No. 50-21) at 6.  The SPD also is silent on whether an average

of actual weeks worked was to be used to calculate "average weekly income," as opposed to

using the number of weeks in a year. As such, a reasonable finder of fact could conclude that the April letter was not a clear repudiation of plaintiff's STD benefits because it did not "clearly alert" him to the fact that he might be entitled to receive benefits based on the number of weeks actually worked in 2003.[5]

Defendants' contention that the October letter clearly alerted plaintiff that his LTD benefits were being improperly offset by the amount of SSD benefits he received likewise is misplaced. Defendants reason that the letter "clearly stated that the Policy allowed for the offset of SSD benefits received, and clearly set forth the amount by which [plaintiff's] benefits would be reduced" thus apprising plaintiff of his alleged injury. Def. Brief (Doc. No. 52) at 16. Plaintiff claims that defendants improperly applied the Social Security offset despite the fact that he was receiving those benefits prior to his disability date under the Plan.

It is true that both the October letter as well as the SPD contained a provision explaining that plaintiff's LTD benefit would be reduced by any amount he was receiving in SSD benefits. Absent in both the October letter and the SPD, however, is the important exception found only in the Policy that states that LTD benefits will be offset by the amount received in SSD benefits "*unless you were receiving them prior to becoming Disabled*." Policy (Doc. No. 50-22) at 20 (emphasis added). Since the October Letter and the SPD did not include or even allude to the exception which is found only in the Policy, a reasonable finder of fact could conclude that there was no information available to plaintiff that should have made him aware of the improper offset upon initial receipt of LTD benefits. Consequently, a

---

[5] Like plaintiff's claim for miscalculation of LTD benefits, the merits of plaintiff's claim for miscalculation of STD benefits are not before the court and it must be assumed that plaintiff has a valid claim to those benefits at this juncture under the applicable standards of law.

reasonable finder of fact could conclude that the October letter was not a "clear repudiation" of plaintiff's claim that his benefits improperly included an offset for SSD benefits.[6]

Miller stands for the proposition that an erroneously calculated award of benefits under an ERISA plan *can serve* as "a clear repudiation," and not for the proposition that *every* miscalculated award will serve as such. Genuine issues of material fact exist as to whether the April and October letters constituted a "clear repudiation" of benefits or otherwise sufficiently apprised plaintiff of the need to further investigate his benefit calculation because something was amiss. Accordingly, defendants' motion for summary judgment must be denied.

Date: February 24, 2011


s/ David Stewart Cercone
David Stewart Cercone
United States District Judge


cc:     Gerri L. Sperling, Esquire

        Thomas M. Cunningham, Esquire

        Via: CM/ECF Electronic Filing

---

[6] The merits of this claim likewise are not currently before the court.

21